## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                          CR. No. 22-889 JCH

KADEEM SHAQUILE OSORIO,

        Defendants.

## MEMORANDUM OPINION AND ORDER

       This case is before the Court on *Defendant Kadeem Shaquile Osorio's Amended Motion to Suppress Evidence* [Doc. 37]. Defendant Osorio argues that law enforcement violated his Fourth Amendment rights to be free of unreasonable search and seizure during their interaction with him on a Greyhound bus, and he asks the Court to suppress as evidence all items found on his person and in his luggage. The Government has filed its response [Doc. 45], and Osorio filed his reply [Doc. 48]. On February 7, 2023, the Court held an evidentiary hearing on the motion at which Defendant was present, and on February 21, 2023, the parties submitted additional authorities [Docs. 67 and 68] for the Court's consideration. After reviewing the law and the evidence, the Court concludes that the motion to suppress should be denied.

## FACTUAL BACKGROUND

       For the purpose of the hearing on the motion to suppress evidence, the Court finds the following facts.[1]

---

[1] As the factfinder, the Court must evaluate the credibility of witnesses and weigh conflicting testimony. The Court did not find the testimony of witness and bus passenger Michael Martin to

Former DEA Special Agent Jarrell Perry has 23 years of experience doing drug interdiction work for the DEA and has been involved in thousands of interdiction operations. Tr. at 8-9. On April 29, 2022, Perry and DEA Task Force Officer Rey Zamarron were at the Greyhound bus station in Albuquerque, New Mexico, performing drug interdiction duties. Tr. at 10, 12. The pair were there to meet the eastbound bus scheduled to arrive at 7:30 a.m. *Id.* at 10-11. When the bus arrived, all the passengers got off so that the bus could be cleaned. Before any of the passengers could re-board the bus, Perry and Zamarron got on the bus, Perry standing toward the rear and Zamarron at the front, just behind the driver's seat, out of the aisleway. Tr. at 13-14, 85. Both wore plain clothes. Tr. at 11. Perry had a firearm, ammunition, Leatherman tool, handcuffs, and a recording device[2] concealed under his clothing. Id. at 11-12. When passengers got on the bus, Perry began speaking with them. Gov't Ex. 1.

---

be credible or reliable. Mr. Martin's testimony was at times at odds with what can be heard on the audiotape. For example, he testified that Perry introduced Task Force Officer Zamarron, saying "This is my partner." Tr. at 129-30. Those words cannot be heard on the recording. Furthermore, Mr. Martin observed the encounter between Perry and Defendant from a vantage point four to six rows behind them, making it difficult for him to hear and observe the encounter. Tr. at 120, 133-34. In addition, Mr. Martin's testimony diverges from that of Perry and Defendant in several significant respects. First, Mr. Martin testified that Defendant handed Perry a backpack. Tr. at 120, 124. However, there is no other evidence that Defendant had a backpack, Tr. at 269, or that he handed a bag of any kind to Perry. Second, Mr. Martin testified that he saw Perry first open and then put his hand into Defendant's bag to search it. Tr. at 126-27. Again, that testimony is inconsistent with the testimony of both Perry and Defendant, neither of whom testified that Perry put his hand into one of Defendant's bags. Third, Mr. Martin testified that when Defendant was arrested, he left behind a camouflage military-style backpack, which was removed at the next bus stop. Tr. at 129. No other evidence supports the assertion that Defendant left behind a bag. Finally, Mr. Martin testified that Defendant was sitting in a window seat during the encounter, Tr. at 134, which is contrary to the testimony of both Perry and Defendant. Thus, the Court chooses not to credit Mr. Martin's testimony in this matter.

[2] This device was used to make Government's Exhibit 1 (hereafter, "Gov't Ex. 1"), the audio recording of the encounter.

As he approached passengers, Perry said things such as, "I'm a police officer, we check the bus here," and asked permission to speak with them. He also asked passengers about their travel destinations, whether they had luggage, whether they had contraband or anything illegal, and whether they would consent to a search of their bags. Gov't Ex. 1. Perry also searched the bags of several of the passengers he spoke to. *Id.*

After speaking with numerous other passengers, Perry approached Osorio, who was seated on the aisle on the left side of the bus, approximately five rows from the front. Tr. at 15. A camouflage duffel bag was sitting in the window seat to Osorio's left. Tr. at 16, 18. In his interaction with Osorio, Perry stood behind him and to the right of Osorio, as was his general practice so that he does not block the passenger's egress. Tr. at 17. Perry began speaking to him in a calm and polite tone. Tr. at 16, 17, 79-80; Gov't Ex. 1. After greeting Osorio, Perry identified himself as a police officer, displayed his DEA badge, and said, "we check the bus here and you'll see me speaking with the passengers. May I speak to you for a moment?" Tr. at 24; Gov't Ex. 1. The recording of the encounter contains no audible response. Gov't Ex. 1. However, Perry testified that Osorio mumbled inaudibly and nodded his head up and down, which Perry construed as agreement. Tr. at 24, 70. Perry asked Osorio how his trip was going; Osorio responded, "It's going good." Gov't Ex. 1. Perry asked Osorio where he was headed, and Osorio responded that he was traveling to Atlanta. *Id.* Then Perry asked Osorio if he had his ticket with him, and if he was traveling with anyone. *Id.* Osorio held up his phone to show Perry his electronic ticket under the name Derrick Jones and indicated that he was traveling alone. *Id.*; Tr. at 25, 71-72.

Next, Perry asked Osorio, "You live in—so where did you start out at, L.A.?" Gov't Ex. 1. Osorio said that he was returning to Atlanta. *Id.* Perry testified that based on his 23 years of

drug interdiction work, Los Angeles stood out to him as a source city and Atlanta as a destination city for illegal narcotics. Tr. at 26. Osorio indicated that he had been in Los Angeles for about two or three days visiting his uncle, and that he had flown there from Atlanta via Spirit Airlines. Gov't Ex. 1. Perry then asked Osorio if he preferred the bus or the plane. *Id*. Osorio did not answer that question directly, but rather offered, "I lost my ID when I was out there visiting." *Id*.; Tr. at 84. When Perry confirmed, "You don't have no ID with you?' Osorio responded, "No, sir." Gov't Ex. 1; *see also* Tr. at 26. This exchange was significant to Perry for three reasons. First, Perry credibly testified that he asked Osorio about identification to see if the name on the ID matched the name on the ticket because in his experience doing drug interdiction work, he has often made drug seizures from people traveling under false names. Tr. at 26-27. According to Perry, Osorio's lack of ID was significant because passengers that know they are traveling under a false name have often tried to conceal that fact by lying and telling him that they have lost their ID or don't have it with them. *Id*. at 27. Second, Perry testified that in his experience, passengers transporting illegal narcotics will often fly on the outbound trip but then take the Greyhound bus with the drugs on the return because the bus lacks security screening. Tr. at 28. Third, Perry noted that between airplane and bus, Osorio had spent about three and a half days traveling to stay in Los Angles for just two or three days. Perry credibly testified that "people that are transporting illegal narcotics often don't spend a lot of time in the city where they're going to. They're there to pick up illegal narcotics and then transport them back." *Id*. at 29.

Perry steered the conversation toward luggage. He asked Osorio if he had luggage on the bus, and Osorio acknowledged that he did. Gov't Ex. 1. Perry and Osorio had a brief exchange in which Osorio clarified which bags were his. *Id*. These included the camouflage duffel bag sitting next to Osorio in the window seat and an open, brown paper Nike shopping bag in the overhead

4

luggage compartment. Tr. at 29. Osorio pointed to both bags, including the Nike shopping bag, to indicate they belonged to him. Tr. at 30-31, 84. Then Perry asked, "And no weapons or anything illegal with you today?" Gov't Ex. 1. Osorio's response, if any, is inaudible on the recording. *Id*. Perry then said, "Would you voluntarily consent for a search of your bags you have for contraband, sir?" Osorio asked, "You say would I voluntarily?" Perry confirmed, "Yes, sir." *Id*.; Tr. at 87. And then Osorio declined, saying, "No, sir." Gov't Ex. 1; Tr. at 31, 87. At this point in the encounter, Osorio had refused to grant Perry consent to search his luggage. Tr. at 109.

Perry then followed up: "Okay. Would you be able to open it up and show me the contents of it?" Osorio responded, "Contents?" Perry then said, "Yes, sir," and after a short pause said, "Thank you, sir." Tr. at 89. The recording contains no audible response from Osorio, (Gov't Ex. 1; Tr. at 89-90), who stood up in the aisle, retrieved the Nike shopping bag, placed it on his seat, and removed one of two shoe boxes inside. Tr. at 32, 33, 92. At this point in the recording, one can hear the sound of paper crinkling, as though someone is moving or opening the paper Nike shopping bag. Gov't Ex. 1. Perry could see the two shoe boxes inside. Tr. at 33. Osorio opened one shoe box to reveal a pair of shoes. Tr. at 32. Then Perry asked, "Get you some new shoes?" and Osorio responded, "Yes, sir." Perry observed, "Those are expensive shoes, aren't they?" Osorio responded, "Air Jordans." Osorio replaced the lid on the shoe box, put it back in the Nike shopping bag, and returned it to the overhead luggage compartment. Tr. at 32. Perry testified that it did not make sense to him why Osorio would open one shoe box and not the other. Tr. at 33.

After pointing out that Osorio had dropped his phone ("You dropped your phone here, I don't want you to lose your phone," Gov't Ex. 1), Perry asked, "Would you be able to do the

same thing with this one too, sir?", while gesturing toward the camouflage duffel bag in the seat next to Osorio's seat. Tr. at 34, 92, 257. Osorio did not respond audibly (Gov't Ex. 1; Tr. at 92), but he stepped toward the duffel bag, unfastened the Velcro that held the two handles together, and partially unzipped the bag approximately halfway. Tr. at 34-35, 94, 110. The unfastening of the Velcro and the unzipping of the bag both can be heard on the audio recording. Gov't Ex. 1. Through that opening, Perry could see two or three rectangular-shaped bundles wrapped in clear, vacuum-sealed plastic. Tr. at 35, 97; Gov't Ex. 4 (photograph of open duffel bag). Based on his training and experience, as well as the rectangular shape of the bundles and the fact that they were wrapped in heat-sealed clear plastic, Perry believed them to contain illegal narcotics. Tr. at 36-37. Also adding to his belief that the bundles contained narcotics was the fact that under the clear plastic, the bundles were wrapped in brown tape—a manner of packaging illegal narcotics that he had encountered many times during his years of drug interdiction work. Tr. at 37-38.

At this point, Perry summoned Zamarron from the front of the bus, and they placed Osorio under arrest. Gov't Ex. 1; Tr. at 39. They then removed Osorio, along with his camouflage duffel bag and Nike shopping bag, from the bus and took them to the local DEA office. Tr. at 39. There, Perry and other DEA agents performed a warrantless search of Osorio's luggage, photographed the contents, and created an inventory of the items found on forms DEA-6 and DEA-12 in accordance with the DEA's inventory search policy. Tr. at 39-40, 42-43, 100; Gov't Exs. 5, 6, and 7.

## DISCUSSION

### I.    Was the Encounter Consensual, or Was Osorio Seized?

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the

encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975, 100 L.Ed.2d 565 (1988)). "[T]he test allows officers to make inquiries so long as they don't throw their official weight around unduly." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). There are no *per se* rules that govern this inquiry; "[r]ather, every case turns on the totality of the circumstances presented." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)).

The Tenth Circuit has enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). "Although no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co*., 439 F.3d 1197, 1203 (10th Cir. 2006)).

Osorio argues that Agent Perry seized him from the beginning of the encounter. As evidence of the non-consensual nature of the encounter, Osorio asserts that he never agreed to speak with Perry, and he points out that Agent Perry failed to inform him of the reason for the officers' presence on the bus. Osorio asserts that Perry and Zamarron blocked his egress from the bus; in particular, he claims that Perry stood in the aisleway next to his seat, preventing him from leaving. He contends that Perry's tone left him with the impression he was not free to decline the request and that Perry failed to inform him that he had the right to decline to talk. Finally, Osorio argues that Perry's "rapid-fire" questions placed him under undue pressure.

For consent to be valid, two conditions must be met: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992). First, the Court notes that Osorio did indicate his consent to speak with Perry. Although Osorio's consent was non-verbal, Osorio nodded his head up and down[3] in response to Perry's question, "May I speak to you for a moment?" This action constituted specific, unambiguous assent. There is no indication that it was not freely given. "[A] defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007).

The next question is whether Osorio's consent to speak with Perry, and therefore the encounter between Perry and Osorio, was voluntary—that is, free of duress or coercion, either

---

[3] The Court credits Perry's testimony on this point.

express or implied.[4] The Court begins its analysis with the non-exhaustive list of factors enumerated by the Tenth Circuit in *Lopez*. The location of the encounter was on a cramped bus, but it occurred in a public setting that was within the view of other passengers. Neither Perry nor Zamarron (both of whom wore plain clothes and kept their weapons hidden) touched or physically restrained Osorio until they placed him under arrest. Although there were two officers present, Zamarron was out of the way at the front of the bus and did not engage with Osorio, so he did not even notice Zamarron until after Perry asked Osorio which bags belonged to him. Tr. at 246. Therefore, Zamarron's presence could not have reasonably affected whether Osorio felt free to terminate the encounter or decline to speak with Perry. The Court finds that the recording of the encounter supports the conclusion that neither Perry's demeanor nor his tone of voice was coercive. Perry did not keep any of Osorio's personal effects; he looked at Osorio's ticket on his phone, and Osorio had no ID to give Perry. All of the foregoing weigh in favor of concluding that Osorio voluntarily agreed to speak with Perry and that the encounter was consensual.

Osorio argues that Perry failed to inform him of the reason for his presence on the bus. That is not entirely true, as Perry did tell Osorio, "We check the bus here and you'll see me speaking with the passengers." It is a vague explanation, but Defendant has not provided this

---

[4] Defendant called Damian Wilson as an expert witness. Dr. Wilson is an Associate Professor of Spanish in the University of New Mexico's (UNM) Department of Spanish and Portuguese. Tr. at 164; Gov't Ex. 8. He holds a master's degree in Spanish linguistics, as well as a Ph.D. from UNM's Department of Spanish and Portuguese. Gov't Ex. 8. At the hearing, Dr. Wilson described his areas of expertise as "sociolinguistics, pragmatics, and language acquisition and teaching." Tr. at 156. The field of sociolinguistics "studies the intersection of speech production with social factors such as gender, age, or social class." Tr. at 157. He also testified that the field of pragmatics is "bringing situational knowledge of the context to bear on the interpretation of all parts of a text, including speech" and is "intended to explore whether the intended meaning of somebody's uttered speech differs from the explicitly expressed meaning." *Id.* The Court did not find Dr. Wilson's testimony to be necessary or even helpful to the Court in understanding the interaction in English between Agent Perry and Defendant, and therefore the Court has not given it any weight.

Court with authority requiring an officer to give any explanation of his or her purpose when engaging in a consensual encounter. Osorio also argues that Perry failed to specifically advise him that he had the right to terminate the encounter or refuse consent. Osorio is correct, but this is the sole *Lopez* factor that weighs in favor of finding that the encounter was not consensual. The Tenth Circuit has stated that a law enforcement officer is not required to give a suspect such an advisement, but rather it is "merely a factor to be considered in the totality of the circumstances." *United States v. Spence*, 397 F.3d 1280, 1284 (10th Cir. 2005) (quoting *United States v. Zapata*, 997 F.2d 751, 757 n.4 (10th Cir. 1993)). Under the circumstances presented here, the Court concludes that this lone factor does not outweigh all those which weigh in favor of finding that the encounter was consensual. In other words, the encounter was consensual and Perry did not seize Osorio until he arrested him.

## II.   Was the Search of Osorio's Bags Coerced, or Was It Consensual?

### A.   Law Regarding Voluntary Consent to Search

Although a warrant is generally required before officers may conduct a search, no warrant is necessary if the owner of the property voluntarily consents. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 114 L.Ed.2d 297 (1991). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973).

> Factors to consider within the totality of the circumstances test include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse

consent, also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (citations omitted). Therefore, the factors to be considered when determining whether a suspect has voluntarily granted consent to search are similar to those for determining whether a police encounter is consensual.

B.  The Arguments of the Parties

Pointing to his initial refusal to allow Perry to search his luggage, Osorio asserts that he did not give Perry voluntary, unequivocal consent to view the contents of his bags, and without such consent the search was unlawful. He points out that he did not give Perry verbal consent to look inside his luggage. Osorio argues that by asking him if he would be willing to show Perry the contents of his bags after Osorio had already refused to let Perry search them, Perry displayed a persistence that left Osorio without any reasonable choice but to comply. Osorio also contends that Perry deceived him as to the reason for the encounter and request to search.

The Government argues that Osorio voluntarily showed Perry the contents of his duffel bag. After Osorio declined to consent to the search, Perry requested a narrower, less intrusive alternative—a request which is not inherently coercive. The Government points out that Perry did not engage in any of the behaviors (blocking the exit, threats, display of weapon, etc.) that tend to show coercion, and that a reasonable officer would construe Osorio's actions in opening the bag as granting consent. The Government also contends that rather than deceiving Osorio, Perry had identified himself to Osorio as an officer searching for contraband.

C.  Analysis

The first question the Court must consider is whether Osorio gave Perry unequivocal and specific consent to show him the inside of his bags. As described above, after Osorio refused to

11

grant consent for Perry to search his bags, Perry asked if he would consent to show Perry the contents of the bags himself. Osorio confirmed, "Contents?" and Perry said, "Yes, sir." Osorio gave no audible response but stood up, retrieved the Nike shopping bag from the overhead compartment, took out the top shoe box, and showed Perry a pair of shoes inside. After Perry asked Osorio if he would be willing to do the same thing with the camouflage duffel bag, Osorio reached for that bag and unzipped it halfway to display the contents. In the Court's view, in both instances Osorio's actions constitute conduct that a reasonable officer would understand to be unequivocal and specific consent to look at what was inside the luggage. As the Tenth Circuit explained in *Guerrero*, consent must be clear, but it need not be verbal. 472 F.3d at 789. By opening the bags and showing Perry what was inside, Osorio left no ambiguity that he was agreeing to show Perry the contents of those particular bags. Furthermore, the Tenth Circuit has found that "non-verbal consent may validly follow a verbal refusal." *Id*. at 790 (citing *United States v. Flores*, 48 F.3d 467, 468-69 (10th Cir. 1995)). Accordingly, the first prong of the voluntariness test is satisfied because Osorio's consent was unequivocal, specific, and sufficiently comprehensible to a reasonable officer.

The second prong requires that the consent be free of coercion—that is, whether a reasonable person would believe he is free to deny the officer's request to search. Beginning with the factors outlined in *Schneckloth*, the Court notes that there is no evidence that Perry used physical mistreatment, violence, threats, promises, inducements, deception, trickery, or an aggressive tone with Osorio at any time. Perry did not display his weapon, but rather wore it hidden under his shirt. As evidenced on the recording of the encounter, Perry's tone remained neutral. Osorio does not suggest that his age, mental condition, or capacity were factors here. Perry did not claim to have lawful authority to search Osorio's possessions. Finally, there were

12

two officers on the bus—hardly an overwhelming number—but Zamarron, standing at the front

of the bus, kept his distance such that Osorio did not even notice him until Perry asked him about

his luggage. Zamarron did not approach Osorio until Perry summoned him to assist in placing

Osorio under arrest. Therefore, the fact that there were two officers does not appear to have

influenced Osorio.

Although Osorio claims that it was inherently coercive for Perry to ask Osorio to show

him the contents of his bag after Osorio had denied Perry's request to search it himself, the Tenth

Circuit has found that an officer is not required to refrain from renewing a request for consent

after a defendant has first denied it. In *United States v. Zubia-Melendez*, 263 F.3d 1155, 1163

(10th Cir. 2001), the officer asked the suspect, who did not speak good English, if he could

search the vehicle for drugs. The suspect replied, "No, never." The officer then asked again to

search the vehicle, and the suspect replied, "Yeah, no matter." Because the suspect did not

hesitate in agreeing with the second request, the court found his consent to be voluntary.

The Court is not persuaded by Osorio's argument that Perry misled him by failing to

disclose the "real" reasons for his presence on this bus and for his request to search Osorio's

bags. The evidence shows that Perry identified himself to Osorio as a "police officer," i.e., as law

enforcement. He showed Osorio his DEA badge and said, "We check the bus here." None of this

is false or misleading. Later, just before he asked for consent to search Osorio's bags, Perry

asked him if he had "weapons or anything illegal" with him. Then, he asked Osorio for consent

to search for "contraband." The Court is hard pressed to see how any of this could have deceived

Osorio. He knew that Perry was a member of law enforcement, that he was checking the bus, and

he was looking for illegal items, all of which was accurate. *See United States v. Ramos-*

*Burciaga*, 839 F. App'x 229, 235 (10th Cir. 2020) (finding that Perry did not act deceptively

when he told bus passenger that he was conducting a security check and was at the bus terminal to determine if passengers were carrying "anything illegal," including weapons or narcotics).

On the other hand, before the search Perry did not inform Osorio of his right to refuse consent to search, or that he was free to leave. Although these factors do weigh against finding that consent was voluntary, they do not outweigh all the other factors supporting lack of coercion that are present in this case. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (finding that an officer is not required to inform a defendant explicitly that he is free to go before requesting permission to search). Indeed, the Tenth Circuit has found that officers' failure to inform a suspect of his right to leave or to refuse consent did not create coercion even when the suspect had been detained for eleven minutes, had been frisked, and was unable to drive away from the scene. *Zubia-Melendez*, 263 F.3d at 1163. If the circumstances in *Zubia-Melendez* did not rise to coercion, the Court is hard-pressed to conclude that there is coercion here, where Osorio had not been detained or frisked.

Taking all of the foregoing into consideration, the Court concludes that under the totality of the circumstances Osorio was free of coercion when he consented to show Perry the contents of his bags. Therefore, the search did not violate his Fourth Amendment rights.

## III.   Did Agent Perry Have Probable Cause to Arrest Osorio on the Bus?

### A.   Probable Cause Standard

"A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *United States v. Sanchez*, 13 F.4th 1063, 1072–73 (10th Cir. 2021) (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)), *cert. denied*, —— U.S. ——, 142 S. Ct. 842, 211 L.Ed.2d 521 (2022). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are

sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id*. at 1073 (quoting *Keylon*, 535 F.3d at 1216). The probable-cause standard "requires only a 'fair probability,' a standard understood to mean something more than a 'bare suspicion' but less than a preponderance of the evidence at hand." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011)). In considering the existence of probable cause, courts must view the "circumstances in their totality rather than individually," and may not "arrive at probable cause simply by piling hunch upon hunch" or ignore those factors that "militate against" a finding of probable cause. *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

B.  Arguments of the Parties

Osorio argues that Perry lacked probable cause to arrest him for committing drug crimes based merely on a "drug courier profile" and a glimpse of what he believed to be a package or bundle through a small opening in the Osorio's duffel bag.

On the other hand, the Government argues that Perry had probable cause to arrest Osorio and seize his bags because: (1) Osorio unzipped the camouflage duffel bag halfway, allowing Perry to see rectangular bundles wrapped in opaque, brown material and vacuum sealed plastic that he recognized as typical packaging for illegal narcotics; (2) Osorio had no identification, a common practice for contraband smugglers traveling under a false name; (3) Osorio was traveling to and from known drug trafficking hubs—that is, from Los Angeles to Atlanta; (4) Osorio spent a significant amount of time traveling to and from a source city, yet stayed there only a relatively short time, and (5) Osorio flew out to the source city, but then took the long bus ride back to a known drug destination city—a common practice for drug smugglers due to the lack of security and screening in the bus system.

15

C.  Analysis

The Court will discuss each fact in turn and then examine whether as a whole they add up

to probable cause. *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022).

First, Perry testified that Osorio's route of travel from Los Angeles to Atlanta was, in his

experience, consistent with smuggling drugs because in his experience LA is considered a source

city while Atlanta is a destination city. Tr. at 26. He also testified that in his years doing

interdiction work, he has made "numerous" seizures of drugs from bus passengers traveling from

Los Angles to Atlanta. *Id*. Of course, on any given day many people who are innocent of

wrongdoing may travel from Los Angeles to Atlanta. Therefore, on its own this fact does not

carry much weight in the probable cause analysis.

In addition, Perry testified that he found it to be significant that Osorio flew to Los

Angeles (a source city for drugs), stayed there only a couple of days, and then took the much

slower, multi-day bus trip back to Atlanta (a destination city). Agent Perry explained the reason

he believed this travel to be significant:

> [Osorio] had traveled by airline, if that was the truth, out to Los Angeles, and then
> his trip to return was approximately two and a half days, which is basically three
> and a half days of travel to stay two or three days. That is significant, because
> people that are transporting illegal narcotics often don't spend a lot of time in the
> city where they're going to. They're there to pick up illegal narcotics and then
> transport them back.

Tr. at 28-29. In the Court's view, in light of Perry's extensive training and experience, this fact

does carry some weight in a probable cause analysis.

Similarly, Perry noted that despite the fact that he had flown across the country from

Atlanta to Los Angeles, Osorio chose to travel by bus on the return trip from the source city to

the destination city:

> That was very significant because passengers that are transporting illegal narcotics often fly one way, and then take the Greyhound bus back on the return trip. And the reason for that is because when you fly, it's a quick trip. And when you travel on the Greyhound specifically, there's no security; no checkpoints; they don't ask for identification. . . . When you transport illegal narcotics or proceeds from illegal narcotics, there's no security, so they decide to travel one way back.

Tr. at 28. The Court credits Perry's testimony on this point in light of his training and experience and concludes that this fact does tend to make it more probable that Osorio may have been committing the crime of drug trafficking.

Also of note to Perry was the fact that Osorio said that he had no identification because he had lost his ID in Los Angeles. Although identification is not required for Greyhound bus travel, Tr. at 84, Perry testified that in his interdiction work he has frequently arrested and made drug seizures from people traveling under false names. Tr. 27. Therefore, Perry asks for ID to see if passengers, like Osorio, are traveling under a false name. *Id*. However, Perry testified that the fact that Osorio said that he had no ID was significant because passengers traveling under a false name have often told him that they do not have their ID, or that they have lost it. *Id*. Again, the Court concludes that this fact does weigh in favor of probable cause to arrest. As the Tenth Circuit noted in *United States v. Johnson*, 43 F.4th 1100, 1108 (10th Cir. 2022), although failure to produce identification can be consistent with innocent behavior, it can weigh in favor of finding probable cause when a police officer draws inferences based on his or her own experience, as Perry did here.

Finally, the Court has found that Osorio unzipped the camouflage backpack about halfway, and that through that opening Perry could see two or three rectangular-shaped bundles wrapped in clear, vacuum-sealed plastic. The Court credits Perry's testimony that the shape and appearance of the bundles (including the use of tape and clear plastic) was consistent with the

manner in which drug traffickers often conceal contraband. He testified that he has seen similar rectangular-shaped bundles wrapped in tape and vacuum-sealed plastic hundreds of times, and with the exception of "one or two occasions," they have contained illegal narcotics. Tr. at 37-38. Therefore, this fact strongly supports probable cause. *See Johnson*, 43 F.4th at 1109 (concluding that Perry's view of a similar bundle hidden in clothing supported probable cause).

The ultimate question the Court must consider is whether the foregoing facts, "in their totality," are enough for probable cause. *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004). The fact most strongly in the government's favor is: (1) Perry's visual identification of the bundles in the camouflage duffel bag. Likewise relevant—but accorded less weight—are (2) that Osorio spent many days traveling to only spend about two to three days at his destination, (3) that fact that Osorio flew from Atlanta (a destination for drugs) to Los Angeles (a source city), but then took the bus back, and (4) Osorio's lack of identification. Taking these facts together, the Court concludes that when Perry observed the bundle in Osorio's backpack, the facts and circumstances within his knowledge sufficiently warranted his belief that Osorio had committed or was committing an offense. *See United States v. Sanchez*, 13 F.4th 1063, 1073 (10th Cir. 2021).

Accordingly, the Court concludes that Perry had probable cause to arrest Osorio, and therefore the arrest was lawful.

## IV.   Was the Search of Osorio's Bags at the DEA Office Constitutional?

### A.   Law On Inevitable Discovery and Inventory Searches

The Supreme Court has recognized "the ultimate or inevitable discovery exception to the exclusionary rule," which applies when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful

means ....” *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L.Ed.2d 377 (1984). “Those lawful means include an inventory search.” *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (citing *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992) (“[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible.”)); *see also Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738, 93 L. Ed.2d 739 (1987) (“[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment.”).

“A so-called inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration.” *Illinois v. Lafayette*, 462 U.S. 640, 644, 103 S. Ct. 2605, 77 L.Ed.2d 65 (1983). Inventory searches are “not treated as investigative searches because they serve three administrative purposes: ‘the protection of the owner’s property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.’” *Tueller*, 349 F.3d at 1243 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976)). “[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.” *Florida v. Wells*, 495 U.S. 1, 4 (1990). The inevitable discovery exception is not intended to put police in a better position but only “in the same, not a worse, position [than] they would have been in if no police error or misconduct had occurred.” *Nix*, 467 U.S. at 443, 104 S. Ct. 2501.

Inventory searches must be analyzed under a two-pronged test. First, they “are reasonable only if conducted according to standardized procedures.” *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). Second, “[t]he policy or practice governing inventory searches should be designed to produce an inventory,” *Wells*, 495 U.S. at 4. In other words, an inventory

search must be justified by the administrative purposes of such searches, *see, e.g., United States v. Edwards*, 632 F.3d 633, 644 (10th Cir. 2001) ("To be justified as an inventory search, ... the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability."). In determining whether the exception applies, courts should be mindful that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification." *Nix,* 467 U.S. at 444 n.5.

B.  The Arguments of the Parties

Osorio contends that the inventory search was not justified because the police, lacking probable cause to arrest him or search his bags, performed the inventory search for investigative purposes. On the other hand, the Government argues that the post-arrest search of Osorio's luggage was a permissible inventory search. It contends that once Osorio was lawfully arrested, the discovery of the narcotics was inevitable due to the DEA's established inventory policy.

C.  Analysis

The Government has satisfied the first requirement—to show that agents acted according to standardized criteria. The DEA's written, standardized inventory policy mandates an inventory search "of all property that is taken into custody by DEA for safekeeping, regardless of whether probable cause exists to search the property," and requires a search of "all containers, whether locked or unlocked, that are lawfully seized for safekeeping." Govt. Ex. 5. As explained earlier, Osorio was lawfully arrested on probable cause that he was engaging in drug crimes. Because he was in DEA custody, agents searched and inventoried his duffel bag, Nike shopping bag, and any other items in his possession at the time of his arrest in accordance with the DEA's written policy. It was therefore inevitable that the illegal drugs found within the backpack were

20

going to be discovered during a routine inventory search, independent of Agent Perry's search, and that Osorio was going to be charged with their possession. *See United States v. Babilonia*, 854 F.3d 163, 178-79 (2d Cir. 2017) ("where a search incident to arrest is not justified, evidence recovered from an immediately ensuing search may be admissible nevertheless if the contents would inevitably have been discovered in a permissible inventory search.").

The Government has also satisfied its burden under the second prong of the reasonableness test—that is, to show that the search resulted in an inventory list. On forms DEA-6 (Gov't Ex. 6) and DEA-12 (Gov't Ex. 7) prepared after Osorio's arrest and the search of his belongings, agents listed and described the evidence and other items seized from Osorio. Therefore, the inventory search was reasonable because the agents acted according to the DEA's standardized inventory policy which was "designed to"—and in fact did—"produce an inventory." *Tueller*, 349 F.3d at 1243.

Accordingly, the Court concludes that the search of Osorio's property after his arrest was a proper inventory search and that the inevitable discovery exception to the warrant requirement applies in this case.

The Government also contends that the contents of the packages that Perry saw in the duffle bag were a foregone conclusion, so the plain view doctrine applies. Having concluded that the inevitable discovery exception to the warrant requirement applies in this case, the Court need not address the plain view exception.

**IT IS THEREFORE ORDERED** that *Defendant Kadeem Shaquile Osorio's Amended Motion to Suppress Evidence* [Doc. 37] is **DENIED**.


_____
**UNITED STATES DISTRICT JUDGE**